UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LEWIS E. GRAHAM II and FLOWORKS, INC.,<br><br>Defendants. | 2:09-CV-250 JCM (LRL) |

**ORDER**

Presently before the court is defendant Lewis E. Graham II's *pro se* motion for summary judgment (doc. #51). Plaintiff the Securities and Exchange Commission (hereinafter "the commission") filed an opposition. (Doc. #52). Defendant filed a reply. (Doc. #57).

The commission filed its complaint against defendants Graham and Floworks, Inc. and relief defendant Linworth LLC, on February 6, 2009, asserting claims for (1) violations of section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") against Graham and Floworks, and (2) equitable disgorgement against Linworth. The commission alleges that Graham, through his entity Floworks, materially misrepresented facts to investors that impacted their decisions relating to the buying and selling of securities.

**Motion for Summary Judgment**

In the motion for summary judgment (doc. #51), Graham argues several points, including, but not limited to, (1) lack of jurisdiction, (2) that no securities transactions occurred, (3) that there

**James C. Mahan**
**U.S. District Judge**

1  was no California operating agreement, (4) his statements were made in reliance on reports from
2  counsel, advisors, consultants, business associates, and others, (5) his actions were legitimate based
3  on his due diligence, (6) the complaint misrepresents facts, (7) his motivations were "stewardship
4  rather than self-interest," (8) all necessary disclosures were made, and (9) that no tax advice was
5  provided. Graham concludes based on the foregoing, that no genuine issues of material fact exist
6  regarding the claim against him, and that the court should enter summary judgment in his favor.

### A.    Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted if the pleadings demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008). The party seeking summary judgment bears the initial burden of informing the court of the basis of its motion, and identifying the portions of the pleadings or otherwise which demonstrate the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

At the summary judgment stage, the facts and inferences must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248, 256; Diaz, 521 F.3d at 1207. Once the movant has met its burden, the non-moving party must set forth facts to show a genuine issue for trial. *Celotex,* 477 U.S. at 324.

### B.    Relevant Facts

During 2002, Graham, through Floworks, became the manager of a real estate investment partnership by the name of Stanford Square Investors, LLC (hereinafter "Stanford"), which had approximately 100 investors. (Doc. #52). The primary asset of Stanford was a building located in Palo Alto, California (hereinafter "the Palo Alto property"), that was initially purchased in 1985 for approximately $15 million. *Id.* Prior to Graham becoming manager, in July of 2002, a trustee for the Securities Investors Protection Corporation named Stephen Snyder announced to investors that he intended to become the manager of the Palo Alto property. *Id.*

After he was informed of Snyder's intention to manage, Graham began to campaign to be

**James C. Mahan**
**U.S. District Judge**

- 2 -

1  appointed manager instead. At that time, Graham owned approximately 2.5% interest in Stanford,
2  and allegedly represented to investors in an August 9, 2002, newsletter that he had "multiple
3  advanced degrees, founded and ran an international management consulting company for more than
4  20 years,...served as a [d]irector of several corporations, and [was] a member of several California
5  business advisory boards." (Doc. #52-24 Exhibit 163). Ultimately, investors voted Graham as
6  manager. (Doc. #52).

7  Shortly after being elected manager, in 2004, Graham began actively trying to sell the Palo
8  Alto property, and sent newsletters to the investors announcing this intention and introducing the
9  option of "deferring the tax affect of any sale through a tax-free transaction known as a like-kind
10  exchange under Section 1031 of the Internal Revenue Code." (Doc. #52-26 Exhibit 165 and Doc
11  #52-6 Exhibit 45). Basically, he was informing the investors in the newsletters that the Palo Alto
12  property could be sold, the proceeds could be used to purchase another investment property, and
13  there would be no tax consequences to them. (Doc. #52).

14  In March of 2005, Graham sent another newsletter (doc. #52-26 Exhibit 165) to the investors
15  explaining that he had secured a non-binding letter of intent to purchase the Palo Alto property which
16  indicated a gross sale price of $33.2 million with a net sales price of $28.5 million. He estimated that
17  each investor's interest would receive nearly $20,000 for each 1% interest in Stanford, and that the
18  investors would realize a "paper profit" from the sale. *Id.* Once again, he assured them that they
19  could avoid paying taxes by entering into a tax-free, like-kind exchange under the Internal Revenue
20  Code. *Id.* He attached a ballot to this newsletter, which asked the investors whether or not they
21  supported the proposed sale. *Id.*

22  In addition to the information regarding the intent to purchase letter, Graham stated in the
23  newsletter that the purchase of the replacement property would "require a separate, additional ballot
24  after the sale and the approval of a [m]ajority-[i]n-[i]nterest of [its] [m]embers." *Id.* In April of that
25  year, Graham sent another newsletter (doc. #52-6 Exhibit 45) informing the investors that he had
26  located a possible replacement property, that he had to commit to millions of dollars in order to keep
27  the deal available, and that he transferred his financial interests "for the benefit of [m]embers and
28

**James C. Mahan**
**U.S. District Judge**

- 3 -

in order to secure an investment opportunity for a [tax-free] exchange." *Id.* The commission argues that these "millions" were actually part of an agreement where Graham agreed to assign essentially all of his financial interests as manager of the Palo Alto property to the seller Langenburg Research, Inc., owned by Albercht zu Hohenlohe Langenburg (hereinafter "Langenburg"), and that he was receiving substantial financial interests in what amounted to a joint venture with the Langenburg and Langenburg Research. (Doc. #52).

After 68% of the Stanford investors approved the sale, the Palo Alto property sold for $33.2 million ($28.5 million in net proceeds). (Doc. #52-8 Exhibit 48). Subsequently, and *without* the approval of the investors, Graham purchased the "like-kind, commercial property," that he described in a newsletter as "several parcels and two (2) buildings in an industrial park in Eugene, Oregon" (hereinafter "the Eugene property"). *Id.* He assured the investors that the Eugene property was the "best exchange opportunity that met all [the] Internal Revenue Code requirements while offering significant, potential financial upside." *Id.*

Following this, Graham made several representations to the investors, including that the property was comprised of "superb high-technology manufacturing space," had been appraised at "$75+ million," that the Eugene market had been "moving upward," and that the parties had "mutually agreed" upon a value of $75 million including "existing land, buildings, improvements and generic equipment *plus* all specialized production equipment installed by seller." *Id.* (Emphasis supplied). Graham informed the investors that the Eugene property would have a "single, high-technology tenant" by the name of H20 Bottling LLC. *Id.* He assured the investors that he had carried out "extensive due diligence" and that H20's business prospects were "enormous." *Id.* Investors were told that H20's lease on the Eugene property would translate to a distribution of $10,000 per year for every 1% interest over the first 3 years of the lease. *Id.*

Finally, the newsletter stated that the purchase of the Eugene property met the requirements for tax-free treatment, and that those who elect to remain in the LLC "will have no current tax liabilities" from the decision to sell Palo Alto property. *Id.* For any investor who did not wish to participate in the purported tax-free transaction, Graham informed them that Langenburg Research

would purchase their interest "for every pre-tax penny [they] would have received from the building sale *if there had been no LLC 1031 transaction plus* [their] *pro rata* share of the additional property purchase down payment that the LLC was required to make for a total cash investment of $3,000,000.00." *Id.* (Emphasis supplied). Approximately 40 investors elected to sell their Stanford interests. (Doc. #52).

### C. Conclusion

In the complaint (doc. #1) and the opposition to the motion (doc. #52), the commission asserts that Graham made "numerous misleading statements and omissions regarding the transactions at issue, including, among other things, the nature of the Eugene property transaction, the identity of the seller of the Eugene property, the value of the Eugene property, [the] tax-free status of the Palo Alto and Eugene property transactions, Grahams financial interest in H20 Bottling, and existing and potential liabilities incurred by [Stanford]." The commission contends that these misrepresentations amount to violations of Section 10(b) of the Exchange Act, and Rule 5b-1 thereunder. (Doc. #1 and #52).

To be successful in his motion for summary judgment (doc. #51), Graham must demonstrate that no genuine issues of material fact exist in the claim against him for violations of the Exchange Act. *Celotex,* 477 U.S. at 317, 323. The commission must prove four elements to establish violations of section 10(b) and 10b-5 of the Exchange Act, including (1) a fraudulent device, material misrepresentation or omission, or an act that operated as a fraud or deceit, (2) in connection with the purchase or sale of a security, (3) scienter, and (4) use of the jurisdictional means. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1996) (discussing the elements of 10b-5); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

In Graham's motion for summary judgment (doc. #51), he argues that summary judgment is appropriate, but fails to provide the court with conclusive evidence to negate the allegations against him and to support the contention that no genuine issues of material fact exist. Graham asserts that **"there are no material facts in dispute** and none that indicate [he] ever detected fraud by others or committed fraud *of any kind* himself." (Doc. #57) (Emphasis supplied). However, the

James C. Mahan
U.S. District Judge

- 5 -

commission points to several facts that indicate fraud occurred, or at the least, that support a finding that a dispute as to the fraudulent and misleading nature of certain activities and representations exists. (Doc. #52).

Specifically, the commission argues that Graham made certain misrepresentations, and provides the court with evidence supporting their assertion that (1) the Eugene sale was *not* a purchase of Stanford from Langenburg Research, but rather a purchase from Western Mechanical by Stanford and Langenburg together for $5.4 million, (2) the value of the property was grossly inflated, as it was actually purchased for $5.4 million, instead of the $17 million that Graham purported to purchase it for, (3) Graham failed to disclose to investors that he had no basis to support the promise that the transaction met the requirements of the tax-free status and had never consulted with an attorney regarding this (doc. #52-29 Exhibit 168, doc #52-30 Exhibit 169, doc. #52-31 Exhibit 170, and doc. #52-32 Exhibit 171), (4) he failed to disclose his current and future financial interest in H20 to investors, and (5) he failed to disclose to investors that he caused Stanford to be liable for loans to Western Mechanical for $1.9 million and to Grand Pacific for $4 million and $1.5 million. (Docs. #52-16, 52-12, 52-13, and 52-14).

Despite the evidence presented, Graham denies that these misrepresentations occurred and provides his own evidence to dispute the allegations against him. Therefore, there are genuine issues as to whether the material misrepresentations and/or omissions occurred. As Graham has failed to meet his burden of proving that no genuine issues of material fact exist as to the violations of the Exchange Act, the court is not inclined to grant summary judgment.

Accordingly,

IT IS HEREBY ORDERED ADJUDGED AND DECREED that defendant Lewis E. Graham II's *pro se* motion for summary judgment (doc. #51) be, and the same hereby is, DENIED.

DATED this 13th day of May, 2011.

_____
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge

- 6 -